BULOVA WATCH COMPANY, INC., Plaintiff, v. ONTARIO STORE OF COLUMBUS, OHIO, INC., Defendant.

Common Pleas Court, Franklin County.

No. 209591.   Decided April 14, 1961.

*Messrs. Crabbe, Garek & Sillman* and *Messrs. Vorys, Sater, Seymour & Pease*, for plaintiff.

*Messrs. Fuerst, Fisher & Weinberg* and *Messrs. George, Greek, King & McMahon*, for defendant.

Leach, J. This case is before the Court on the demurrer of the defendant to the petition, which demurrer raises the

question of the constitutionality of at least a substantial portion of the 1959 Fair Trade Law, Sections 1333.27 to 1333.34, inclusive, Revised Code. The enactment of these statutes followed the decision of the Ohio Supreme Court in *Union Carbide and Carbon Corp.* v. *Bargain Fair, Inc.*, 167 Ohio St., 182, which held that the Ohio Fair Trade Act of 1936, Sections 1333.06 to 1333.10, Revised Code, was unconstitutional to the extent that it prohibited those who were not parties to a price-fixing contract from selling a commodity for less than the price stipulated in such contract.

The principal question presented at this time is whether the 1959 Act is subject to the same constitutional objections as the 1936 Act. The 1936 Act prohibited persons who had not actually agreed to do so from selling at a price less than that stipulated in a contract if such was done "knowingly and wilfully." The 1959 Act, in essence, seeks to accomplish the same end result by providing that the acceptance of such a commodity by a distributor (regardless of the source from which acquired), shall constitute an agreement not to resell at less than the minimum price stipulated therefor by the "proprietor" of the trade mark or trade name.

In order to more fully understand the nature of the questions here presented, a brief legislative and judicial history is necessary. By the Sherman Act of 1890 contracts, combinations and conspiracies in restraint of trade in interstate commerce were made illegal. The Valentine Act, now Section 1331.01 et seq., Revised Code, did the same for intrastate commerce in Ohio and specifically forbade price fixing. In 1911, the United States Supreme Court in *Dr. Miles Medical Co.* v. *John D. Parks & Sons Co.*, 220 U. S., 373, held that a contract between a manufacturer and a retailer in interstate commerce as to prices at which the retailer would sell products sold to it by the manufacturer was in violation of the Sherman Act.

The Ohio Fair Trade Act of 1936 was enacted in July of that year. It was substantially identical to acts of other states passed during the years beginning in 1931, including one passed by Illinois. In *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp.*, 299 U. S., 183 (1936), the United States Supreme Court held that the non-signer provisions of the Illinois Act did

not contravene any rights secured by the Federal Constitution. Since such act applied only to intra-state commerce, the *Old Dearborn case* did not invoke the Sherman Act.

In 1937 Congress enacted the Miller-Tydings Act, 15 U. S. C. Sec. 1, which amended the Sherman Act to provide that such Act would not make illegal "contracts or agreements" prescribing minimum prices for the resale of a commodity bearing a trade mark, brand or name of the producer or distributor which was in free and open competition with commodities of the same general class, when "contracts or agreements" of that description are lawful in intrastate transactions under any statute, law, or public policy in any state in which such resale is to be made.

In *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S., 384 (1951), the United States Supreme Court held that the provisions of the Miller-Tydings Act exempted from the operation of the Sherman Act only "contracts or agreements" prescribing minimum prices for resale, and thus did not exempt as to interstate commerce the prohibitions of the Sherman Act as applied to persons who did not actually so contract.

In 1952 Congress enacted the McGuire Act, 15 U. S. C., 45 to provide that nothing contained in any of the federal Anti-trust Acts shall render unlawful the exercise or the enforcement of any right created by any state statute, law or public policy "which in substance provides that wilfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements, whether the person so advertising, offering for sale, or selling is or is not a party to such contract or agreement * * *" is prohibited by such state law.

In *Schwegmann Bros. Giant Super Market* v. *Eli Lilly & Co.*, 205 F. (2d), 788, it was held that the non-signer provision of the Louisiana Act was by the McGuire Act made applicable to interstate commerce as an exception to the Federal Anti-trust Laws and as such did not contravene any provisions of the Federal Constitution. Certiorari was denied by the United States Supreme Court, 346 U. S., 856.

Thus from the *Federal* standpoint, we have a situation where it seems to be clearly established (1) that a non-signer provi-

sion of a state law as applied to intra-state commerce does not violate the *Federal* Constitution, *Old Dearborn, supra*, (2) a non-signer provision of a state law is made applicable to inter-state commerce as an exception to the Sherman Act and all other Federal Anti-trust laws by the McGuire Act, and (3) the applicability of such a non-signer provision to inter-state commerce does not violate any provision of the *Federal* Constitution, *Schwegmann* v. *Eli Lilly & Co., supra.*

From the *State* point of view, however, neither the language of the Miller-Tydings Act or the McGuire Act nor the decisions referred to above, limit in any way the power of a state court to pass on the constitutionality of a state act under the constitution of such state, regardless of whether the question before the Court involves intra-state or inter-state commerce.

The courts of some states have upheld the constitutionality of such acts, including the non-signer provisions. The courts of other states have held such acts to be unconstitutional, at least in-so-far as the non-signer provision was concerned. The cases so holding, pro and con, and language contained therein as it might be persuasive as to the issues now before this Court, have been cited and quoted in the extensive briefs filed herein. As to this it should be sufficient to point out that the issue here involved is not whether we agree or disagree with the conclusion of the Ohio Supreme Court in the *Union Carbide case.* Such holding is now established law in this state and as such, binding on this Court. Instead, as stated before, the principal issue is whether the 1959 Act is subject to the same constitutional objections as the 1936 Act.

Two Common Pleas Courts have held that, at least to a degree, the 1959 Act is subject to such constitutional objections. In *Helena Rubenstein* v. *Cincinnati Vitamin & Cosmetic Distributors Co.*, 84 Ohio Law Abs., 143, 12 O. O. (2d), 199, Gusweiler, J., of the Common Pleas Court of Hamilton County, held the 1959 Act to be unconstitutional on the basis of all three of the grounds of unconstitutionality of the 1936 Act as held by the Ohio Supreme Court in the *Union Carbide case*, i. e. (1) it represented an unauthorized exercise of the police power in a matter unrelated to the public safety, morals and general welfare, (2) that it was an improper delegation of legislative

power to private persons and (3) that it unconstitutionally denied the owner of property the right to sell it on terms of his own choosing.

In the companion cases of *Hudson Distributors, Inc.* v. *Eli Lilly and Company*, No. 730,118, and *Hudson Distributors, Inc.* v. *The Upjohn Co.*, No. 727,805, McNeill, J., sitting by assignment in the Common Pleas Court of Cuyahoga County, held that the 1959 Act was unconstitutional in that it delegated legislative power to private persons. Such decisions, while somewhat persuasive of course, are not necessarily binding on this Court.

We turn now to the specific respects in which the 1959 Act differs from the 1936 Act and to the question of whether such changes from a constitutional point of view distinguish the two acts. Parenthetically, although not necessarily involved in the questions before this Court, it appears that the 1959 Act did not by its terms repeal the 1936 Act and both are contained in the Revised Code at this time.

Many different facets of this problem have been referred to in the briefs of counsel which total in excess of 150 pages. In addition, an extensive oral hearing was held. Then, too, we have read in full the transcription of the proceedings of hearings before the House and Senate Judiciary Committees of some 340 pages, attached to the briefs. We also have had the benefit of the record and the briefs in the Ohio Supreme Court in the *Union Carbide case* as an aid to a complete understanding of the scope of the decision in that case.

Relative brevity being desirable in any judicial opinion, within the limits of our ability and without the extensive discussion contained in the briefs, made in oral argument, and also made by Mr. James A. Gorrell, one of counsel for plaintiff, in his discussion of the legal questions involved in speaking on behalf of the proposed bill before the House and Senate Judiciary Committees, we shall attempt to set forth the basic claims and our own holding with respect thereto.

In our opinion, overriding every other potential question is the question as to whether the 1959 Act is unconstitutional as delegating legislative power to private persons.

Plaintiff asserts correctly that the *Union Carbide case* held

the 1936 Act unconstitutional only to the extent that it prohibited those who were not parties to the contract from selling for less than a price stipulated in such contract. It asserts that under the 1959 Act, the defendant is a party to such a contract. By the *terms* of the 1959 Act, this is true. The Act provides that "Any distributor (whether he acquires such commodity directly from the proprietor or otherwise) who with notice that the proprietor has established a minimum retail price for a commodity, accepts such commodity, shall thereby have entered into an agreement with such proprietor not to resell such commodity at less than the minimum price stipulated by such proprietor." The petition (after amendment at bar January 28, 1961) alleges that defendant, after such notice, acquired and sold such commodities.

At first blush, at least, it would seem to be a rather strange legal doctrine which would say that if one "knowingly and wilfully" sold at less than certain minimum prices in violation of a specific interdiction of statutory law, such would nevertheless be legal, but if one did exactly the same thing where the law said he had agreed to do so (without regard to any true intent), such would be illegal.

To this, plaintiff has two answers. First, it is asserted that the 1936 Act did not by its terms require that the retailer have knowledge of such minimum price requirements at the time he *acquired* the commodity, whereas the 1959 Act does. Such contention in our opinion overlooks the true meaning of "knowingly and wilfully." In the *Old Dearborn case, supra*, identical language of the Illinois Act was upheld from a Federal Constitutional point of view only as applied to a dealer who, with full knowledge of an existing price restriction, *acquired* such commodity, and at page 193 thereof the words "wilfully and knowingly" were construed as requiring such. True, the Ohio Supreme Court in the *Union Carbide case*, did not, as to Ohio Constitutional problems, follow the rationale of the United States Supreme Court as to Federal Constitutional problems as announced in the *Old Dearborn case*, but throughout the *Union Carbide case* it appears to have been assumed that Bargain Fair, Inc., had acquired the Prestone in question with full knowledge of such minimum resale prices, and the decision

of the Ohio Supreme Court was not based on any lack of knowledge at the time of acquisition. In our opinion, the 1959 and 1936 Acts cannot be constitutionally distinguished on such basis.

Secondly, it is asserted by plaintiff that the 1959 Act merely removed a bar to the freedom of persons to contract in such area and thus did not create any "right" or delegate to such persons "legislative authority" when they exercised this right of *voluntary* agreement.

In essence, the contention of plaintiff in this respect is as follows: Plaintiff starts with the proposition that resale price maintenance contracts were valid at common law. It asserts that such contracts therefore are only invalid to the extent that they are in violation of statutory law such as the Sherman Act or the Valentine Act. By the terms of the Miller-Tydings Act and the McGuire Act, such contracts no longer violate the Sherman Act, by the terms of the 1959 Ohio Act (and also of the 1936 Act), such contracts no longer violate the Valentine Act. Then it is asserted that a true contract in the common law meaning of a "contract" exists between the plaintiff and the defendant; that defendant "was under no compulsion to purchase plaintiff's goods with plaintiff's trade-mark thereon but it admittedly knew that if it did so, the price that it must pay to utilize that trade-mark to assist it in further disposition of these goods was its agreement not to sell at less than the minimum resale price which it knew plaintiff had stipulated therefor;" that while "this is a new concept in fair trade acts, it is certainly not novel in contract law" but is "merely the statutory statement of a basic principle of contracts;" that by putting the matter on "a pure consensual basis" the 1959 Act removed such legislation from any constitutional prohibitions as found in *Union Carbide* to be applicable to the 1936 Act.

We agree that as to actual common law contracts, the 1959 Act makes such contracts legal, and enforceable as to the parties thereto. The same is true of the 1936 Act. We do not agree, however, that under the common law principles of contract, such a contract exists between the plaintiff and the defendant herein.

Let us suppose that Congress would simply repeal all

Anti-trust legislation, including the Sherman Act, the Miller-Tydings Act, and the McGuire Act, and that the Ohio General Assembly were to repeal the Valentine Act, the 1936 Act and the 1959 Act. We then return simply to the common law. With such assumption would a valid common law consensual contract be created *merely* by the fact that (1) plaintiff established minimum resale prices, (2) plaintiff gave notice to defendant of such minimum resale prices and further, notified defendant that if it acquired such commodities from any source of supply, such acceptance would constitute an agreement with the plaintiff not to sell below such minimum resale prices, and (3) defendant, after such notice and with such knowledge, accepted such commodities? We think not.

Under such a supposed set of facts, if plaintiff were the owner and possessor of such commodities and was negotiating a direct sale to the defendant and in such process of the offer of sale attached such limitations, and if defendant, with full knowledge of such conditional offer of sale, ordered such commodities without protest or reference to such limitations contained in the offer, it might be possible to construe defendant's unreserved acceptance of plaintiff's conditional offer of sale as constituting a common law contract on a consensual basis.

In *Johnson and Johnson* v. *Charmley Drug Co.*, 11 N. J., 526, 95 Atl. (2d), 391, a somewhat similar scheme was followed. A signed "fair-trade" agreement existed between Johnson & Johnson, as producer, and McKesson & Robbins, as wholesaler. This case arose after the decision of the United States Supreme Court in the *Schwegmann case* and before the McGuire Act became effective. McKesson & Robbins had notified the retailer that "whenever you make any purchase hereafter of the products of Johnson & Johnson * * * you will know that these products are subject to and covered by the Fair Trade Agreement which will be covered on our invoices." The later invoice contained such Fair Trade Agreement. The retailer, however, by letter accepted delivery of the merchandise but rejected the agreement. The key question in the case was whether there was a contract or agreement within the purview of the Miller-Tydings Act. The Court, relying on language from the *Schwegmann case*, held that a contract does not come into existence

unless there be a manifestation of "mutual assent" by the parties to the same terms, that there must be a "meeting of the minds."

In the instant case the petition does not allege any conditional offer of sale by the one from whom defendant acquired the Bulova watches or any facts to show an acceptance of such conditional offer by the defendant. All that is alleged is that defendant, after notice from plaintiff, "acquired and sold" such commodities. In fact, it is conceded in argument by counsel for plaintiff that defendant did not acquire such commodities directly from plaintiff. Thus we conclude that the petition does not allege facts showing any *common law* contract.

In this connection much has been said in argument as to "privity." Plaintiff asserts that any requirement of "privity" of contract is an outmoded legal concept and in effect has been abolished in Ohio by the decision of the Ohio Supreme Court in *Rogers* v. *Toni Home Permanent* Co., 167 Ohio St., 244. In the first place, any inroads made as to a requirement of "privity" in the *Toni case* are limited to situations where a consumer suffers harm "by reason of deleterious ingredients" in the product itself, which certainly is not involved here. Here, we find no "privity." Furthermore, the conclusion reached herein that a *common law* contract between the parties in the sense of mutual assent has not been pleaded and does not exist, is reached independently of any question of "privity."

But, plaintiff asserts in effect, even if a common law contract does not exist *independent of statute*, the 1959 Act provides that the defendant by accepting such commodities after notice of established minimum resale prices "shall thereby have entered into an agreement" not to resell below such prices; that with defendant's knowledge of this law, its acceptance of such commodities is conclusive of the fact that it did actually voluntarily assent thereto; that this is but another example of the well established principle that statutory obligations are read into and become a part of any contract voluntarily entered into after the enactment of such legislation.

This basic contention seemingly is supported by the case of *Standard Drug Co.* v. *General Electric Co.*, 117 S. E. (2d), 289, a decision by the Supreme Court of Appeals of Virginia.

The Virginia statute is substantially identical to the 1959 Act of Ohio. In fact, it appears that the draftsmen of the 1959 Act used the Virginia Act as a model. After commenting that the Virginia Act no longer contained a "non-signer" provision, the Court, in discussing the question of whether it unconstitutionally delegated legislative power to private persons, tersely stated:

"Here the restriction imposed by the manufacturer or: producer was agreed to by the retailer when, with full knowledge of the restrictions, he acquired and accepted the flashbulbs. No compulsion is practiced and no retailer is bound except by his own agreement."

Cited in support of this statement and as being "dispositive of the contention that the act violates" the constitutional provision that legislative power shall be vested in the General Assembly (thus forbidding a delegation of such power to private persons), is certain language from page 192 of the Old Dearborn case to the effect that Section 1 of the Illinois Act (identical to Section 1333.06, Revised Code, of the 1936 Ohio Act) did not contain any element of "compulsion."

At least as applied to Ohio law in the light of the holding in Union Carbide, we are of the opinion that such reasoning would be an over-simplification of the problem if construed as including within its scope situations such as we have here where the seller of the commodity to the retailer did not make a conditional offer which the retailer inferentially accepted (thus satisfying the common law requirement of mutual assent).

In the Standard Drug Co., case, it should be noted that there was a direct transaction of offer to sell (with conditions attached) and an order of merchandise by the retailer and an acceptance of the merchandise (without protest as to any conditions made in the offer). Contrast with Johnson & Johnson v. Charmley Drug Co., supra, where the retailer specifically rejected such conditions, thus removing the element of "mutual consent" or "meeting of the minds."

In the instant case we conclude that the element of "compulsion" is present to the same extent, no more and no less, than it was in the 1936 Act. The 1936 Act contained such "compulsion" by its requirement that non-signers must abide by

such minimum resale provisions if they chose to deal in such commodities. As heretofore noted, the words "knowingly and wilfully" carried the connotation that the commodity be acquired with knowledge of such minimum resale prices. The retailer was just as free to decline to purchase such commodities under the 1936 Act as he is under the 1959 Act. The 1959 Act contains the same "compulsion" by its language that by the acceptance of the commodity he "shall thereby have entered into a contract," by its provisions that a "proprietor" (either the person identifying a commodity produced by him by a trademark or trade name or a person granted by such producer sole authority in this state to establish minimum resale prices) may "establish" such prices, and by its language making it "unlawful" for any distributor to sell such commodities at less than such established minimum resale prices if he has "notice" of such.

If we were considering this case before *Union Carbide*, we would have the problem of deciding between two possible judicial approaches to the problem as mentioned by Zimmerman, J., in such case. We could have adopted the rationale of *Old Dearborn* that no true "compulsion" exists because the "restriction, already imposed with the knowledge of the appellants, ran with the acquisition and conditioned it," and that "their voluntary acquisition of the property with such knowledge carried with it * * * assent to the protective restriction, with consequent liability * * *."

In view, however, of *Union Carbide* our problem is whether the "compulsion" of the 1959 Act is any less than that of the 1936 Act. Here, as a matter of constitutional law, we deal not with words or semantics but with substance.

Concluding that the *same* degree of "compulsion" is present in the 1959 Act as was present in the 1936 Act, we must necessarily conclude that the 1959 Act does not merely *permit* parties to enter into a consenual agreement involving "mutual assent," but instead is a purported exercise of the "police power." In this connection plaintiff's assertion, inter alia, that in any event Sec. 2, Art. XIII of the Ohio Constitution authorizes such legislation by authorizing the passage of laws "regulating" the sale and conveyance of personal property would

seem to indicate that this is a "regulatory" measure passed in the purported exercise of the "police power" and not merely a "permissive" measure. The briefs in Union Carbide advanced the same arguments as to the effect of this Constitutional provision. In our opinion the 1936 Act was a regulatory measure. In our opinion the 1959 Act is a regulatory measure.

If, as definitely held in *Union Carbide* (which holding, in our opinion, is not dicta as asserted by plaintiff), such regulation cannot be delegated to private persons, the same is true as to the 1959 Act.

In both acts the question of whether minimum resale prices shall be established, whether, if established, they shall continue, the amount of such prices and the changing of such amount from time to time are all delegated to private persons to be exercised in their uncontrolled discretion without any legislative standards or criteria.

To assert that the two acts may be constitutionally distinguished on the basis that under the 1959 Act the defendant has "agreed" thereto, is to say that even though a General Assembly cannot constitutionally regulate a course of conduct by certain means (as held in *Union Carbide*), such constitutional limitations have no application where the General Assembly provides that a certain act of the party sought to be regulated shall constitute an "agreement" to be so regulated. Under such philosophy there is scarcely any constitutional principle which could not thus be avoided.

It, of course, is true that all contracts, the subject matter of which involves the public welfare, will have read into them with the same force and effect as if expressed in definite terms all *valid* public regulations essential for the health, safety or welfare of the people. 11 Ohio Jurisprudence (2d), 410, et seq. Here, however, the statute purports to make a contract where none otherwise would exist and then to regulate conduct in the guise of merely enforcing such legislatively made contract. In our opinion, the validity or invalidity of such regulation must stand or fall on the constitutional power to so regulate by the means actually employed, and such power cannot be enlarged by an "agreement" of legislative compulsion. Either the General Assembly has the power to regulate by

such means or it does not. If it does not have such power, how can it be said that knowledge of the same facts and the doing of the same acts by private individuals could confer such power merely because such is called an "agreement." An implied obligation to abide by the law itself certainly is not a lesser obligation than the obligation to abide by a legislatively imposed "agreement."

We do not express any opinion as to whether the General Assembly could by a statute not delegating legislative power to private persons, regulate minimum resale prices, i. e. whether such a statute would be "an unauthorized exercise of the police power" or whether such a statute would "unconstitutionally deny the owner of property the right to sell it on terms of his own choosing." We are, however, in full agreement with the holding of McNeill, J., and one of the holdings of Gusweiler, J., in the cases heretofore referred to that the 1959 Act is unconstitutional as delegating legislative power to private persons.

We have not overlooked, in reaching this conclusion, many of the other contentions of counsel, including the assertion that the 1959 Act has either created or recognized a property right in the commodity *itself* after he has sold it to distributors, so long as the trade-mark or trade name remains thereon. Section 1333.31, Revised Code. Standing alone, we would doubt the authority of the General Assembly to so create a property right. But this provision does not stand alone. It is but part of a legislative scheme designed as to its end result to compel persons to abide by minimum resale prices established by private persons, not to create property rights as such. In effect, it is but a legislative statement of a reason why it felt it had the power to regulate *by such means.* In *Union Carbide,* this same reason was urged upon the Court and rejected.

Parenthetically we might also note that the petition does not reveal the date when plaintiff sold the commodities in question or whether such sale was in the State of Ohio. If it had parted with full title before the effective date of the Act, or such happened out of Ohio, we would be unable to comprehend how a part of such title could revert.

One other aspect of this case should be mentioned. As mentioned before, the Miller-Tydings Act exempted from the Sher-

man Act only "contracts and agreements" prescribing minimum resale prices. It is clear, we believe, from the Opinion of the Court in the *Schwegmann case* that this Act authorized *only* contracts in the sense of truly consensual agreements without resort to coercion or compulsion, including state legislative compulsion. In other words, we think it clear that, at least in the absence of the McGuire Act, actions taken under the 1959 Ohio Act to establish minimum resale prices would be in violation of the Sherman Act, for the reason that a legislatively established "agreement," absent true common law "mutual assent" or "meeting of the minds," would not come within the purview of the words "contracts or agreements" as contained in the *Miller-Tydings Act*. See also *Johnson & Johnson* v. *Charmley Drug Co., supra.*

The McGuire Act, Title 15, Sec. 45, P. (2d), U. S. C., also refers to "contracts or agreements" and must be given the same meaning. Then in Par. (3) it makes lawful the enforcement of any right created by state law which, in substance, provides that wilfully and knowingly selling at less than the price "prescribed in *such contracts* or *agreements*" is actionable "whether the person so * * * selling is or is not a party to *such a contract* or *agreement.*" We think it clear that the words "contract or agreement" as employed in Par. (3) as well as Par. (2) of the McGuire Act, have the same meaning as these same words employed in the Miller-Tydings Act, as construed by the *Schwegmann case.*

This situation has given rise to the proposed Harris Act, (H. R. 1253), which would amend the McGuire Act to permit the establishing of minimum resale prices by notice.

Thus it would appear that the provision of the 1959 Ohio Act requiring *no* "contracts or agreements" within the purview of the Miller-Tydings Act or the McGuire Act, would not fall within the scope of such acts and any minimum resale prices established without such "contracts or agreements" would be in violation of the Sherman Act.

But, says plaintiff in effect, our petition alleges two signed agreements with other Ohio retailers prescribing such minimum retail prices. Thus we have complied with the requirements of the McGuire Act, although the 1959 Ohio Act does not by its

terms require such other contracts. Defendant, of course, is not a party to these other contracts.

Thus plaintiff, in our opinion, is caught on the horns of a dilemma. To take advantage of the McGuire Act, it must rely upon the existence of "contracts or agreements" with others and the non-signer provisions of the McGuire Act. In such event, this case being based on Ohio law, it must rely on the nonsigner provisions of the 1936 Act, but it cannot, since such was held in *Union Carbide* to be unconstitutional. On the other hand, if it relies solely on the 1959 Act, we have a situation where it is subject to the Sherman Act since the "agreement" by operation of law here relied on, in our opinion, is not a "contract or agreement" as those words are employed either in the Miller-Tydings Act or the McGuire Act.

In view of the conclusions we have reached herein, we express no opinion as to the second branch of defendant's demurrer wherein it is asserted that under the provisions of Section 1703.29(A), Revised Code, plaintiff, as a foreign corporation, lacks capacity to sue, except to say that if it be true that defendant is not licensed to transact business in the State of Ohio (a matter concerning which the petition is silent), a most intriguing question would be presented. If one were to reach a conclusion on the basic merits of the constitutional issue to the contrary of that which we have expressed above and to accept the premise that plaintiff has a property right, or a "proprietory interest" in the commodity *itself* (for all purposes, and not merely as a part of a regulatory scheme to validate the establishing of minimum resale prices as binding on those who refuse to agree to such) in every Bulova watch held by a distributor in Ohio, could it be said that plaintiff "was engaged in this state *solely* in interstate commerce?" Section 1703.02, Revised Code. Some interesting personal property tax problems might also arise.

For the reasons heretofore expressed, the first branch of defendant's demurrer is sustained. Since it is apparent from the nature of our holding that the defect cannot be remedied by amendment (Section 2309.60, Revised Code), the temporary restraining order heretofore issued herein is dissolved, the petition is dismissed and final judgment is rendered in favor of the

defendant and against the plaintiff at the costs of the plaintiff. Entry may be prepared accordingly, reserving exceptions.