RUBBERMAID, INC., *v.* CLABER DISTRIBUTING CO. OF CLEVELAND, OHIO, INC.

(No. 784774—Decided March 5, 1965.)

*Messrs. Thompson, Hine & Flory, Mr. William D. Ginn, Mr. John F. McClatchey, Messrs. Critchfield, Critchfield, Critchfield & Johnston* and *Mr. Lincoln Oviatt*, for plaintiff.

*Messrs. Metzenbaum, Gaines, Schwartz, Krupansky, Finley & Stern, Mr. Elmer I. Schwartz* and *Mr. Donald M. Robiner*, for defendant.

THOMAS, J. Plaintiff, Rubbermaid, Incorporated of Wooster, Ohio, seeks a permanent injunction and damages against Claber Distributing Co., of Cleveland, Ohio, Inc., which owns and operates seven Uncle Bill's stores, all located in Cuyahoga County. Hereafter the plaintiff is called Rubbermaid, and the defendant is called Uncle Bill's.

Trade-marked "Rubbermaid," rubber, wire, and plastic houseware products are manufactured by the plaintiff. Extensively advertised under the trade name "Rubbermaid" these housewares are sold and distributed in Ohio and throughout the United States. Rubbermaid's houseware products, with a few exceptions, bear minimum retail prices which Rubbermaid stipulates and notices under the 1959 Ohio Fair Trade Act, Section 1333.27-34, Revised Code.

Uncle Bill's characterizes its seven retail stores as discount department stores. Uncle Bill's admits actual notice of Rubbermaid's fair trade agreements with Ohio retailers of Rubbermaid's houseware products; and Rubbermaid's establishment of minimum retail resale prices for certain of these products. Uncle Bill's further admits that it has acquired and subsequently offered for sale and sold certain Rubbermaid houseware products at prices below the minimum retail resale prices designated by Rubbermaid. It is Uncle Bill's continued sale of Rubbermaid's housewares below fair-traded prices which Rubbermaid seeks to permanently enjoin. By agreement plaintiff's claim for damages is reserved for hearing after the court rules on the request for injunctive relief.

Uncle Bill's challenges the constitutionality of the 1959 Fair Trade Act, and asserts certain affirmative defenses.

At the conclusion of plaintiff counsel's opening statement, defendant's counsel, renewing a ground first raised by demurrer, moved for judgment. He concedes that the 1959 Fair Trade Act was declared constitutional by the Cuyahoga County Court

of Appeals in *Hudson Distributors, Inc.,* v. *Upjohn Co.,* 117 Ohio App. 207. But he points out that the affirmance of *Hudson* by the Ohio Supreme Court (174 Ohio St. 487) was by a 3 to 4 vote. Section 2 of Article IV of the Ohio Constitution says that:

"No law shall be held unconstitutional * * * without the concurrence of at least all but one of the judges, except in the affirmance of a judgment of the Court of Appeals declaring a law unconstitutional and void."

Moreover he argues that *Hudson's* subsequent affirmance by the United States Supreme Court, 377 U. S. 386, 12 L. Ed. 2d 419, 84 Sup. Ct. 1561, merely determined that the Federal McGuire Act exempted the 1959 Ohio Fair Trade Act from the Federal Anti-Trust laws. In short, he argues that *Hudson* is only the law of that case.

Determining that *Hudson,* a decision of the Cuyahoga County Court of Appeals, is clearly binding on this court the motion was overruled. That ruling is reaffirmed.

As related to the elements which plaintiff must prove to warrant injunctive relief under the 1959 Fair Trade Act the evidence supports and directs the following findings.

Rubbermaid manufactures principally a housewares line of products, though it also makes commercial and industrial type products such as rubber and vinyl throw mats for automobiles. Typical housewares for the kitchen are drainboard mats, dishpans, dish drainers; for the bathroom typical items are bathtub mats, and toilet top trays; and for general house use there are wastebaskets, storage bins and cabinets, and floor mats. Rubbermaid's entire line of houseware items numbers about 100. In addition many of these items are produced in different colors. As a manufacturer the plaintiff is a "producer" under Section 1333.28, Revised Code.

Quality Housewares is the caption of its 1965 Catalog-Price List. Voiced most positively by defendant's Vice-President, the evidence reveals that plaintiff's products fully measure up to the quality claim. Registered as separate trade-marks with the U. S. Patent Office are a red panel shape, the included name "Rubbermaid" and the words "Means Better Made," which usually appear in the red panel immediately below the name "Rubbermaid." Patented with the U. S. Patent Office under Patent No. 191,901 are "Safti-Grip" bathtub and shower mats.

The plaintiff qualifies under Section 1333.28, Revised Code, as a "proprietor," "who identifies a commodity produced by him by the use of his trade-mark."

Throughout the country there are a number of companies which manufacture rubber, plastic, and wire houseware products of the same type and class as plaintiff's houseware products. A list of 21 major competitors of Rubbermaid houseware products is in evidence. It is determined that, as required by Section 1333.29, Revised Code, Rubbermaid houseware products are "in free and open competition with commodities of the same general class produced by others and offered for sale in the same general market area."

It has long been Rubbermaid's policy to fair trade its houseware products. In states permitting fair trade minimum resale prices, executed agreements with retailers who handle Rubbermaid products are required. This was true in Ohio under the 1936 Fair Trade Act declared unconstitutional in *Union Carbide & Carbon Co.* v. *Bargain Fair, Inc.* (1958), 167 Ohio St. 182. In 1962, since the passage of the new Act in 1959, new agreements have been prepared by Rubbermaid. Over 1100 retailers in Ohio have signed these, and in Cuyahoga County some 150 retailers have entered Rubbermaid written agreements. The "Rubbermaid Authorized Retailer Fair Trade Agreement," in part, provides:

2. Rubbermaid products now or hereafter made subject to this agreement are and will be distributed under Rubbermaid's trademark, brand or name in free and open competition with commodities of the same general class produced or distributed by others.

3. Retailer agrees (except as specifically permitted by statute) not to advertise, offer for sale, or sell the products listed in Schedule A hereto attached or in said Schedule A as it may from time to time be amended at less than the minimum retail selling price stipulated on such Schedule for such a sale.

Uncle Bill's declines to sign an agreement with Rubbermaid. But it acknowledges receipt of written notices of Rubbermaid's fair trade agreements "establishing minimum Fair Trade retail prices on all 'Rubbermaid' trademarked housewares advertised or sold in Ohio."

Defendant Uncle Bill's has sold and is selling fair traded

Rubbermaid Housewares below the stipulated minimum retail selling price. Experiencing difficulty in obtaining sources of supply, it frankly states it would sell more Rubbermaid products if available. It clearly regards Rubbermaid Housewares as quality merchandise that it desires to sell. Unless enjoined it is manifest that Uncle Bill's will continue to sell fair traded Rubbermaid Housewares below minimum resale retail prices.

The next essential element of the plaintiff's case arises under the proviso supplied by the second sentence of Section 1333.29, Revised Code. It reads:

"Such minimum resale prices may be differentiated as to various levels of distribution, provided such differentiations are not otherwise unlawfully discriminatory."

Does the evidence show that Rubbermaid's minimum resale prices, differentiated as to various levels of distribution, are not otherwise unlawfully discriminatory? The language of the proviso must first be interpreted.

This proviso can hardly refer to any particular statutory prohibition against discriminatory prices. The Valentine Act (Anti-Trust) (Section 1331.01 et seq., Revised Code), is not applicable, nor is there any other Ohio statute which is. Moreover the Federal Robinson-Patman Act, 15 U. S. C. 13a, even if otherwise applicable, may only be enforced by one of its specified and self-contained remedies, *Bruce's Juices* v. *American Can Co.*, 330 U. S. 743; *Carter Products, Inc.*, v. *Riteprice Merchandise, Inc.*, 23 (N. Y.) Misc. 2d 230.

This proviso is construed to mean that within (as distinguished from between) each level of distribution of the proprietor's products (*i. e.*, retailer or wholesaler) the minimum resale prices must not be unlawfully discriminatory. Stated affirmatively, it is discriminatory minimum resale prices within the same level of distribution which is unlawful. There is no evidence that Rubbermaid is setting different minimum retail resale prices for different retailers. Nor is it claimed that this is happening.

Section 1333.32 (B), Revised Code, provides:

"(B) Any person suffering or reasonably anticipating damage by reason of a violation of this section may bring suit in any court of competent jurisdiction in the state to:

"* * *

"(2) Obtain injunctive relief whether or not specific monetary damages are established; * * *"

Under this language no proof of monetary damages is necessary to establish irreparable injury, as a prerequisite to injunctive relief. Moreover by earlier language of Section 1333.32, Revised Code, it is an act of unfair competition for a distributor with notice of fair traded prices to sell below those prices. Non-compliance with the stipulated minimum retail resale prices irreparably injures the proprietor's minimum resale price maintenance program. Under the Act this is sufficient proof of irreparable injury.

The essentials of its case being satisfied, plaintiff establishes its right to permanent injunctive relief, unless the defendant has proved an affirmative defense which defeats plaintiff's right to relief. "While the Fair Trade Act does not make provision therefor, the courts have engrafted equitable defenses on the right of manufacturers to enforce the Fair Trade Act," *The Lionel Corporation* v. *Phil Klein* (Delaware Court of Chancery), 114 A. 2d 652.

Considering defendant's affirmative defenses in the order in which they appear, the defendant first claims:

"* * * plaintiff has failed to enforce diligently or fairly its alleged agreements, written, or otherwise, with its distributors or other retailers, as to minimum resale prices."

The evidence indicates that with the exception of Uncle Bill's, and the Ontario Stores (like Uncle Bill's, a subsidiary of Cook Coffee Company), other retailers in Ohio are complying with Rubbermaid's minimum retail resale prices. The evidence concerning Ontario Stores is incomplete. From the evidence in the record it appears that Ontario Stores is a discount merchandiser comparable to Uncle Bill's, with stores in Cincinnati, Columbus, and perhaps elsewhere in Ohio. Legal efforts to enjoin Ontario Stores from selling below fair trade prices have failed in Columbus, *Bulova Watch Co.* v. *Ontario Stores,* 86 Ohio Law Abs. 585, and apparently, recently, also in Cincinnati.

Any refusal of courts in Franklin County and Hamilton County to enjoin Ontario Stores from selling Rubbermaid products below fair trade prices does not prove Rubbermaid is less than diligent in pursuing legal remedies to enforce its established program of minimum retail resale prices. What it does

46

prove is lack of statewide uniformity in judicial determination of the constitutionality of the 1959 Fair Trade Act due primarity to Section 2 of Article IV of the Ohio Constitution (language, *supra*).

Further charging lack of diligent enforcement of its minimum price maintenance program the defendant claims that Rubbermaid is acquiescing in the practice of The May Company, a direct retailer of Rubbermaid, in giving Double Eagle Stamps on each Tuesday. This practice, it is said, grants a price concession greater than the three percent limitation of Section 1333.32, Revised Code.

Plaintiff admits knowledge of the practice but insists that the practice does not violate Section 1333.32, Revised Code.

The May Company gives Eagle Stamps with the purchase of merchandise at its stores in Cuyahoga County. One Eagle Stamp is given for each ten cents of the purchase price (before taxes), figured to the lower even dime. Stamps are given on credit purchases conditioned on payment being made by the customer within fifteen days after the date of mailing the customer's statement. By inference, cash purchases on days other than Tuesday likewise entitle the purchaser to Eagle Stamps on the same basis.

On Tuesdays only, when a purchase is made and paid for in cash (including check) at the time of purchase, two Eagle Stamps are given on each ten cents of purchase price computed as above stipulated. If the purchase on Tuesday is for credit, one stamp only is given upon payment within fifteen days, as in the case of all types of purchases on days other than Tuesdays.

To be redeemable all Eagle Stamps must be pasted in a stamp book provided by the Company. A full book consists of 1380 stamps, having a coupon value of $3.00. On the basis of a $3.00 coupon representing $138 in purchased merchandise the discount may be computed at 2.17 percent. A book filled with double stamps represents a discount of 4.34 per cent.

These computations roughly conform to refund deductions. On merchandise returned for refund without the stamps when stamps have been given at the rate of one stamp for each ten-cent purchase, The May Company deducts two and one-half percent of the purchase price from the amount to be refunded. But where two stamps have been given for each ten cents of the

purchase price on Tuesdays, on return of the merchandise without the stamps five per cent is deducted from the purchase price.

Assuming that Section 1333.32, Revised Code, applies to Double Stamps on Tuesdays these stamps are identical to single stamps in character as well as value. Therefore whenever May Company gives Double Eagle Stamps on a fair-traded Rubbermaid Housewares product the purchaser is receiving a price concession in excess of the maximum three percent allowed by Section 1333.32, Revised Code. This assumption the plaintiff vigorously disputes.

Plaintiff urges that the second stamp is different from the first. It contends that the first stamp is a credit transaction stamp; and this is authorized by Section 1333.32, Revised Code. It argues that the second stamp, given on cash purchases on Tuesday, is a cash discount not subject to any limitation of Section 1333.32, Revised Code. Rubbermaid's Fair Trade Agreement authorizes the second stamp, it is said, in these terms:

"Unless otherwise prohibited by law, a bona fide cash discount may be given in an amount not exceeding three percent (3%) of the minimum retail selling price only under the following terms and conditions:

"1. The discount must be in the form of cash, trading stamps, coupons, cash register receipts or analogous form."

In actual fact The May Company does not distinguish the first from the second of the double stamps. Thus the single stamp is not given only in credit transactions. On days other than Tuesdays the so-called single stamp is given for cash purchases, as well as on credit purchases. Moreover the May Company advertising always refers to Double Eagle Stamps on Tuesday. It never differentiates the second Tuesday stamp. Also only one type of stamp redemption book is provided. In this book are pasted, indiscriminately, second stamps as well as single stamps. Everything considered the single stamp, among other things a discount for prompt payment of bills, is held to be a price concession or cash discount. So is the second of the double stamps.

Examination of Section 1333.32, Revised Code, makes it evident that Rubbermaid and The May Company cannot by private agreement create a trading stamp that is immune from Section 1333.32, Revised Code. By its plain terms, Section

1333.32, Revised Code, embraces all price concessions, and trading stamps. It specifies that in determining whether the sale of a commodity is below the proprietor's stipulated minimum resale price "any concession made, whether by the giving of coupons or otherwise" shall be deducted from the price. Only the succeeding proviso legalizes trading stamps. Section 1333.32, Revised Code's proviso permits:

"* * * the allowance by a distributor to his customers of trading stamps or other redeemable certificates, when the amount or value of such allowance does not exceed three percent of such stipulated minimum resale price, * * *,"

This proviso embraces all trading stamps, irrespective of their purpose. It leaves no room for any type of price concession stamp to operate outside of its three percent limitation. Old as is the May Company's sixty-year practice of giving Double Eagle Stamps on Tuesday its venerability does not put the custom beyond the reach of the plain and positive three percent trading stamp limitation of Section 1333.32, Revised Code.

Plaintiff's counsel suggest that it may be difficult to enforce an end to May's practice of giving Double Eagle Stamps on Tuesday on the cash purchase of Rubbermaid fair traded products. Nothing in the record suggests that The May Company will not conform to the three percent trading stamp limitation, now that its applicability to Double Eagle Stamps on Tuesday has been judicially determined. The evidence does reveal that Rubbermaid has a built-in enforcement means at its disposal. Presumably, Rubbermaid's control over its retail representatives at May's is sufficient to enforce the ban against Double Eagle Stamps on Tuesday. Rubbermaid's retail representatives, who principally sell Rubbermaid products, can themselves refuse to give the extra stamps. Other means of enforcement as well are at Rubbermaid's disposal.

Defendant proves Rubbermaid's lack of diligent enforcement of its minimum price maintenance program, in knowingly permitting May's Double Eagle Stamps on Tuesday to be given on Rubbermaid cash purchases.

As long as The May Company, a dominant retailer in Greater Cleveland and in the State, continues to violate the 1959 Fair Trade Act, with Rubbermaid's consent or acquies-

cence, the plaintiff is not entitled to the injunction it seeks against the defendant's breach of the same Act. To hold otherwise would offend equity's most honored maxim, that he who seeks equity must do equity. The order hereafter constructed is accordingly designed.

In its next affirmative defense the defendant contends, that plaintiff has knowingly initiated, permitted and acquiesced in special sales at substantially reduced prices, discounts, allowances and confessions by others in the retail sale of "Rubbermaid" products.

Section 1333.29, Revised Code, authorizes price changes in these words—

"Such prices may be changed from time to time by written notice to distributors who acquired such commodity with notice of any established minimum resale price."

The plaintiff announces its permanent price revisions in several ways. The basic list of stipulated prices is Schedule A of the Rubbermaid Fair Trade Agreement. A revised Schedule A is mailed annually to each Rubbermaid retail dealer effective January 2nd. Also sent to all retail dealers and to its other accounts is the attractively colored and illustrated Catalog-Price List issued annually. This publication includes company item number, picture, and description of each item, together with the current revised price list. An up-to-date price list is also separately published twice a year. Both the Catalog-Price List and the Price Lists state that prices are subject to change and that the listed products are fair traded in states having Fair-Trade statutes in effect.

During the course of the year Catalog Supplements are issued and distributed. Expressly amending revised Schedule A the Supplements list any new products, price reductions and discontinued items. Though not explained in the Supplements, the evidence developed that discontinued items are freed from stipulated price restrictions. To aid in merchandising discontinued items the retailer may sell these items at any price. A marketing necessity, this departure from minimum resale price maintenance illustrates that absolute price fixing is a merchandising impossibility. Nevertheless it shows no intent to abandon the fair trade program.

It is the special or promotional sales, conducted once or twice a year, which defendant claims represents an abandonment of plaintiff's fair trade price program.

With approximately four items involved in the sales, the number of sales items, in and of itself, is not a substantial part of the approximately 100 fair traded Rubbermaid Houseware products. In addition, the limitation of the price reduction to a fixed and limited period of sixty days evidences an intent to maintain and only to temporarily reduce the stipulated minimum resale prices.

Defendant's objection if correctly understood, goes to the size of the price reductions, and to the announcement of comparative old and new prices to gain maximum consumer attention and acceptance. Thus in the 1964 Fall Sale one Rubbermaid promotional flyer declared "Rubbermaid Dishpans $1.57 Regularly $1.98—Priced to Build Traffic at Full Profit." Another brochure proclaimed "Retails Reduced Up to 25% on Aluminum Top Counter Mats." A bulletin to all Rubbermaid Houseware Salesmen in July 1964 added Wastebaskets as a fall special. News of the one-third reduction in retail prices climaxes the sales appeal,

"We're a sneaky bunch at Rubbermaid . . . I'd like to tell you about a 'Housewares Show Special' we're unveiling . . . to the amazement of our friends and customers (and the consternation of our enemies and competitors).

"We've taken the four top selling Rubbermaid Rectangular Wastebaskets

". . . picked the fastest selling colors

". . . packed the entire assortment in *one* shipping carton

". . . picked the peak fall selling period

". . . Reduced Retail Prices By One-Third"

The evidence reveals that the promotional sale price reductions and for that matter all other price reductions are brought to the customer's attention through various marketing techniques. Specially printed stickers attached to the container declare 1/3 off:—Reg. Price $1.49—Now 99c. A Safti-Grip Bathtub Mat Box bearing the printed price of $3.98 carries a sticker —Price Reduced—Now $3.49. Where stickers are not available a line may be drawn through the old price with the new price

written in below, to emphasize comparison prices. Reported were numerous instances of Rubbermaid products on display in Cleveland's large department stores with markdowns of this type.

Department Store newspaper and direct mail advertisements of the 1964 Fall Sale specials further illustrate the same deliberate appeal to the bargain hunting consumer. One ad stated—1/3 Off Rubbermaid Specialties. The products featured were wastebaskets and storage turn-tables. A direct-mail booklet among many products of different manufacturers included Rubbermaid aluminum-top stove and counter mats—25% off.

One of the plaintiff's witnesses was asked about a drain board mat, on which the printed price of $1.50 was scratched and $1.29 written thereunder. He answered,

"Since the purpose of reduction in the retail price is to make it available to the consumer at the new retail price, we welcome anything that can be done to tell the consumer * * * that she can now buy it at the new retail price of $1.29."

Asked whether by seasonal promotions it was hoped to improve consumer acceptance of Rubbermaid products he answered,

"This is only one of the purposes or reasons * * * It is general practice in the business, in the trade, to have seasonal promotions and as one of the major manufacturers of housewares we are of course expected by our customers to also have seasonal promotions."

This sampling of the evidence shows, and it is found, that the comparative pricing marketing policy and practice of Rubbermaid is designed and serves to whet customer demand and retailer enthusiasm. It helps Rubbermaid and its retailers meet the competition of manufacturers of comparable brand name products. It fosters plaintiff's "free and open competition with commodities of the same general class produced by others."

Defendant's main point in this affirmative defense will be paraphrased. One of the legislative purposes of the fair trade law is to safeguard the good will attached to the proprietary interest in trade-marked products. If Uncle Bill's price reduc-

52

tions of trade-marked fair traded products is said to adversely affect Rubbermaid's good will, defendant argues that Rubbermaid's special sales at substantially reduced prices, and Rubbermaid's comparative pricing policy and practice similarly adversely affect Rubbermaid's good will. By this adverse effect, it is claimed Rubbermaid's Special Sales and comparative pricing work an abandonment of its minimum retail resale price maintenance.

When able to buy Rubbermaid's products from a wholesaler Uncle Bill's purchase price is forty percent off list (the same as retail hardware and houseware dealers). It sells Rubbermaid products approximately one-third off list (minimum retail resale price). On the average it reports its mark-up is 22 to 25 percent above cost; and that this reduced mark-up is made possible by self service merchandising and other low overhead expense. Actually it appears that Uncle Bill's is selling Rubbermaid products at only ten percent above its cost. For one-third off list is 66c on a dollar item. The selling price of 66c is but ten percent above its 60c cost (forty percent off one dollar list).

Selling Rubbermaid products at a mark-up of only ten percent, substantially below its average 22 to 25 percent mark-up, justifies the finding, now made, that Uncle Bill's is pricing Rubbermaid's quality products to attract customers. This pricing may be termed a reduced-price-leader. Yet it is not the fair-trade item loss leader tactic attributed to discount stores by the *Hudson* finding (174 Ohio St., at page 494).

"When * * * the discounter uses fair-trade items as a come-on, selling items at cost or even at a loss to entice customers into his store * * *"

Comparable to defendant's regular one-third reductions plaintiff's 1964 fall specials had price reductions varying from a minimum of 21% to a maximum of 37%. Wastebaskets were reduced one-third, and Storage Turn-Tables 37%. Drainboard Mats, Stove 'n Counter Mats, and Dishpan mark-downs ranged between 21% and 25%.

Plaintiff's witnesses insist that if Rubbermaid institutes the price changes, if the price changes are made in the context of frequency and items involved, and if the price changes are

available to all retailers Rubbermaid's good will is not adversely affected. However they insist that any unilateral price change by a single Rubbermaid dealer alone adversely affects good will.

The weight to be given this evidence depends on whose good will is in question. The good will of the retail dealers of Rubbermaid products is undoubtedly furthered by the maintenance of minimum retail resale prices. Likewise when a price reduction in stipulated prices is sponsored by Rubbermaid and made available to all retail dealers their good will for Rubbermaid is fostered. Conversely when a single retailer succeeds in selling Rubbermaid fair trade products below stipulated prices Rubbermaid good will in the minds of Rubbermaid retailers is damaged and impaired.

Section 1333.31, Revised Code, of the Fair Trade Act grants a proprietor a retention of a proprietary interest in his trade-marked products, by reason of his interest in stimulating demand for such commodity through effective distribution to ultimate consumers and of his interest in continuing protection of the good will associated with his trade-mark or trade name. *Hudson* makes it plain that the good will which the Act seeks to protect is consumer good will (demand). Thus it finds (174 Ohio St., at page 495):

"The majority of present-day consumer purchasing is by brand name. Today the public demand necessary for retail selling is created to a great extent not by the retailer but by the manufacturer, the owner of the trademark * * *. The value of any trademark is, of course, the demand for the product which it represents * * *"

As far as consumer good will (demand) is concerned, the plaintiff spends a great deal each year to maintain this. Of its 1964 estimated advertising expenditures $36,000 went to trade advertising while $512,600 went to consumer advertising; and of the $888,820 estimated as Rubbermaid's 1964 sales promotion expenditures, $448,500 was for co-op merchandising allowances (department store advertising reimbursement).

However, there is nothing in this record which supports the factual assumption of *Hudson* (174 Ohio St., at page 495):

"The continued discount selling of a trade-marked product eventually cheapens it in the eyes of the purchasing public. If

such product is sold at a reduced price the public will eventually get the idea that the product is cheap and turn to others, seeking higher quality merchandise.''

There is nothing to indicate that Uncle Bill's sale of Rubbermaid products at one-third off list price has cheapened Rubbermaid in the eyes of the purchasing public. On the contrary it is quite clear in the record that the Rubbermaid trade-mark and trade name remain synonymous with quality. Human nature, being what it is, a consumer wants Rubbermaid quality at the lowest prices. Illustratively, a Rubbermaid witness was asked, ''When people learn prices are reduced would that affect good will?'' He honestly answered, ''* * * when we generally reduce a price, we hope the consumer will say, 'Gee, that's wonderful, now I can afford this item, maybe.' ''

Upon the evidence it is determined that consumer good will (demand) for Rubbermaid products is not impaired by reductions below previous fair-traded prices. Accordingly it is found that consumer good will for Rubbermaid is not adversely affected or disadvantaged by price reductions on Rubbermaid's fair trade products, whether Rubbermaid or Uncle Bill's reduces the prices. Consumer good will not being harmed thereby plaintiff's price policies and practices cannot and do not abandon its minimum price maintenance.

The authority under Section 1333.29, Revised Code, to change stipulated minimum resale prices ''from time to time'' is broad enough to include the right to set temporary minimum resale prices during special sales. The statute however requires that the change be accomplished by ''written notice'' to the proprietor's distributors. What does ''written notice'' mean?

Section 1333.28 (J), Revised Code, defines notice as actual notice by any method provided by Section 1333.30, Revised Code. Actual notice however must be ''written notice.'' It therefore cannot be oral, and it cannot be by advertising. The proprietor may give the notice of price changes by mail to each distributor. Or if the price change is clearly marked on the merchandise the statute specifies that this ''shall be conclusive evidence of actual notice of such minimum resale prices.''

Judge Griffith in *Hudson Distributors* v. *Upjohn Co., supra* (174 Ohio St. 487) at page 496 says,

"Here we have the producer of a commodity * * * fixing the price only of his own commodity."

This is nonetheless a unilateral power, even if by contract, express or implied, the distributor has assented to the proprietor's right to fix prices. As Judge Leach said in *Bulova Watch Co.* v. *Ontario Stores, supra,*

"* * * the question of whether minimum resale prices shall be established, whether, if established, they shall continue, the amount of such prices and the changing of such amount from time to time are all delegated to private persons to be exercised in their uncontrolled discretion without any legislative standards or criteria."

Indispensable to the exercise of a power of this magnitude, whether it involves stipulating prices originally, or in making later price changes, written notice of any price change must be given equally and without discrimination to all distributors.

Applying these conclusions Section 1333.29, Revised Code, is construed to require Rubbermaid, in writing, to directly notify all its retail distributors in the same manner and at the same time. Actual written notice has been directly given to Rubbermaid wholesalers and all of its direct retail customers. With the use of flyers distributed by its wholesalers notice of price changes in special sales have been given its retail hardware and houseware dealers. There is no evidence that any retail dealer failed to get notice of the special sale price changes.

In this state of the record prior non-compliance with "written notice" of special sale price changes, insofar as the retail hardware and houseware dealers are concerned, cannot prevent plaintiff's request for injunctive relief. Nevertheless prospective operation of the order hereafter issued will be conditioned upon future notice of price changes being given to all retailers, directly and in writing.

The defendant further claims that the plaintiff has abandoned its price maintenance program through the manufacture and sale of "a bath mat which does not have a minimum stipulated resale price but which is identical in all respects with one which has, except only the imprint of the Rubbermaid name on the product." The plaintiff rightly insists that there is no compulsion to fair trade all of its houseware products. It insists further that the mat's difference in quality explains the lower price of the non-fair traded bathtub mat.

Since evidence in support of this claim has been received without objection, and the point has been fully argued, it will be ruled on, even though there is no affirmative defense which clearly covers this claim.

The bathtub mats in question are the fair traded Item No. DO 7038, and the non-fair traded Item No. DO 0450.

Both mats are 14 inches by 22½ inches in size. Both mats bear imprints of U. S. Patent No. 191,901. To the untrained eye there is no great difference in the quality of the rubber in each; but Item No. 7038 does have many more suction cups than Item No. 0450. By actual count Item No. 0450 has 288, while Item No. 7038, by estimate, has 526.

Item No. 7038, the fair-traded bathtub mat is packaged in a box labeled Rubbermaid Safti-Grip Bathtub Mat, and bears the Rubbermaid trade-mark imprinted on the mat. Item No. 0450, the non fair-traded bathtub mat which sells for 80c less, is packaged in cellophane. Inside is a visible litho label, which at the top reads Safti-Grip Bathtub Mat; and the label at the bottom bears the Rubbermaid trade-mark.

Upon this evidence it is determined that a consumer may confuse non-fair-traded Item No. 0450, a Safti-Grip Bathtub Mat, with the same sized Safti-Grip Item No. 7038, a fair-traded bathtub mat. Admittedly Item No. 0450 is a promotional item. A cheaper bathtub mat it may easily be mistaken by the consumer for the Safti-Grip Bathtub Mat, Item No. 7038, which apparently is of better quality. Neither packaging nor labeling informs the consumer which item is fair traded, and which is not fair traded.

Insofar as Item No. 7038 is concerned, as in *Krupsaw* v. *Luskin*, 1956 Trade Cases 68,288, "* * * the public is permitted to believe, albeit erroneously, that it can buy the same kind of articles at substantially lower prices." It is therefore determined that the manufacturing and sale of Item No. 0450 effects an abandonment of the minimum resale price on Item No. 7038.

The claim of the defendant being sustained as to Safti-Grip Bathtub Mat, Item No. DO 7038, this particular item will be excepted from the effect and application of the injunctive order hereafter issued.

Finally to be considered is the affirmative defense which defendant designates Fourth Defense. It reads—

"During all times herein concerned, plaintiff has had in effect a system of pricing its 'Rubbermaid' products for sale to retailers whereby certain retailers and classes of retailers have received discriminatory advantages by way of additional discounts, demonstrator allowances and advertising allowances; said practice by the plaintiff being entirely inconsistent and in conflict with its alleged program of resale price maintenance."

Previously no unlawful discrimination was found to exist in minimum resale prices at the various levels of distribution. The present claim is something else. Here it is claimed discriminatory price discounts by way of demonstrator and advertising allowances favor certain retailers and classes of retailers.

For each class or level of distributor this is the Rubbermaid price structure. The wholesalers purchase from Rubbermaid rubber and wire houseware products at list (minimum retail resale prices) less 50% and 4%; and plastic houseware products at list less 50% and 10%. (Whenever two percentages are combined the second is a percentage of the first.) Rubbermaid's agreements with its wholesalers stipulate minimum resale prices to the retail hardware and houseware dealers at list price less 40%.

Rubbermaid sells direct to several classes of retail dealers. It sells direct to variety chains at 40% and 5% off list; and to premium accounts (said to approximate wholesalers but not otherwise described in the evidence) at 50% and 6% off list.

Rubbermaid also sells direct to department stores. Asked what is meant by the term department store it answers—we mean traditional department store. No more specific definition is suggested. Department stores buy from Rubbermaid at 40% and 5% off list. However if the department store contracts with Rubbermaid for its demonstrator program (now known as the retail representative program) and agrees to the terms and conditions of participation the department store buys from Rubbermaid at 40% off list (without the added 5% off).

Every $6,000 in Rubbermaid purchases during the preceding year qualifies a department store for a one-quarter demonstrator unit. At $12,000 in Rubbermaid purchases the department store would be eligible for a one-half unit; and so on. Thus at

$24,000, a full unit would be available (one demonstrator) and at $30,000 one and one-quarter units would be available.

The wages of a demonstrator, varying between $50 and $57 a week, are either paid direct by Rubbermaid or if paid by the department store are reimbursed by Rubbermaid. A full time demonstrator is expected to devote all her time to Rubbermaid sales and promotions.

The dollar value of the demonstrator program is computable. Purchases from Rubbermaid of $24,000 represents $40,000 (list price) less 40% or $16,000. At $55 a week the demonstrator's annual salary of $2860 represents almost 18% of the $16,000. Hence 40% and 18% off list produces a lower price (and probably an increase in business) contrasted with the 40% and 5% off list price at which the direct retail dealer (department store) buys who does not participate in the demonstrator program.

The demonstrator program, with its promotion and increased sale of Rubbermaid products, is advantageous to Rubbermaid. The participating department stores stock all or most of Rubbermaid's entire line of housewares. Their displays are extensive. Their customers represent a large and receptive consumer market. Adequate consideration existing for the demonstrator allowances, the allowances are determined not to be price cuts in disguise. Moreover the demonstrator allowances are held not to be deliberately discriminatory or intentionally harmful to the defendant.

A similar conclusion is reached concerning the 3% cooperative merchandising allowance which reimburses department store advertising of Rubbermaid products for media expense actually incurred. Here too an obvious promotional advantage redounds to Rubbermaid. Payment for this consideration, undoubtedly valuable to Rubbermaid, fails to prove the defense claimed.

A related but different question is whether, as a prerequisite to granting of injunctive relief, this court has the power and the duty to require the plaintiff to remove all financial preferences from its price structure. Should the plaintiff, in granting demonstrator and advertising allowances, be compelled to scuttle its vague department store classification and permit any retailer to participate when it reaches $6,000 (one-fourth

demonstrator unit) in Rubbermaid purchases? Should the plaintiff be required to make the 3% co-op merchandising allowance (now available to department stores) also available to its wholesalers? Increase of the present 2% allowance by one percent could be used by the wholesalers to directly advertise Rubbermaid products for the wholesalers' hardware and houseware retailers. This would clearly aid these small retailers more than the department store advertising of Rubbermaid products, from which plaintiff's witnesses insist the small retailer derives a vicarious benefit.

The only small retailer who appeared as a witness testified that customers, seeing his regular Rubbermaid prices, leave his hardware store without buying. Undoubtedly he attributes this to Uncle Bill's reduced price of Rubbermaid products, even though offers to prove this point were ruled inadmissible. Protection of the small retailer from discount retailing below fair trade prices is within the legislative purpose of the Act "to protect and preserve small business." To achieve the same legislative purpose may equity require the proprietor to extend its pricing and allowance advantages equally to small and large retailers alike?

Everything considered, the power to balance the equities is deemed not broad enough to permit this court to so regulate the plaintiff's manner of doing business.

Within the context of this case an equitable defense must relate to a proprietor's conduct which either violates the 1959 Fair Trade Act, or is inconsistent with the maintenance of plaintiff's minimum retail resale prices. Applying this test, the Fourth Defense, under the evidence, is not sustained.

The Fifth and Sixth Defenses have each been previously stricken as a matter of law.

Upon the whole record an injunction will be granted in favor of the plaintiff and against the defendant, to enjoin the defendant from selling, offering for sale or advertising for sale any product manufactured by plaintiff and bearing plaintiff's trade-marks, brands, names or labels, at prices less than the minimum retail resale prices now or hereafter established by plaintiff pursuant to its fair trade agreements and contracts, but said injunction shall be conditioned upon the following terms:

1. The injunction shall become effective thirty days from the date of the Journal Entry, unless at a hearing to be held, if necessary, five days prior to the effective date the defendant establishes that the practice of The May Company, at any of its stores in Cuyahoga County, of giving Double Eagle Stamps on Tuesday on the cash purchases of Rubbermaid fair traded products has not ceased.

2. The plaintiff shall hereafter give direct written notice to each Ohio retailer of Rubbermaid fair traded products of any price revision or change, whether made in connection with a special sale or otherwise.

3. Excepted from this order is Safti-Grip Bathtub Mat, Item No. DO 7038.

4. The question of damages is reserved.

5. This order is subject to the further order of this court.