# Hudson Distributors, Inc., *v.* Eli Lilly & Co.

[Cite as Hudson Distributors, Inc. v. Eli Lilly & Co., 4 Ohio Misc. 73.]

74

(No. 730118—Decided July 14, 1965.)

Injunction: Court of Common Pleas of Cuyahoga County.

*Messrs. Lane, Krotinger & Santora, Mr. Ernest C. T. Santora, Mr. John E. Purdy* and *Mr. Morlee A. Rothchild,* for plaintiff.

*Messrs. Henderson, Quail, Schneider & Peirce, Mr. Louis S. Peirce, Mr. Phillip A. Ranney* and *Mr. Raymond E. Rough,* for defendant.

LYBARGER, J. In an action to enforce the Ohio Fair Trade Act, where an injunction is sought and relief equitable in nature is possible, the decision depends to the greatest extent upon the facts involved in the individual case. There are no reported Ohio cases in point on the subject. All too frequently opinions from other jurisdictions which have come to the attention of the court in this field of law have lacked a satisfactory review of the facts involved, hence are of limited value as precedents. The court, therefore, sets forth at length the basic facts on which its decision is made.

History of the Case.

This suit was brought in October 1959, by Hudson Distributors, Inc. (hereafter called Hudson) against Eli Lilly & Company (hereafter called Lilly) to obtain a declaratory judgment which would construe the Ohio Fair Trade Act, Sections 1333.27 to 1333.34, Revised Code, that became effective October 22, 1959, and declare the Act constitutional. After the filing of an amended petition in January 1960, Lilly answered and cross-petitioned. By agreement the case went to trial only on the constitutional question and in July 1960, this court declared the Fair Trade Act unconstitutional. On review the Court of Appeals of this county, by a two to one decision (*Hudson Distributors, Inc.. v. Upjohn Co.,* 117 Ohio App. 207) on July 13, 1961, reversed this court and held the law constitutional. In the Supreme Court of Ohio four of the judges declared the Fair Trade Act unconstitutional and three determined it was valid. By reason of Section 2, Article IV of the Constitution of Ohio (requiring the concurrence of all but one of the judges to pronounce a law void except when affirming a judgment of the Court of Appeals that declares a law unconstitutional) the Fair Trade Act of 1959 was held to be constitutional (*Hudson Distributors, Inc., v. Upjohn Co.,* 174 Ohio St. 487). The Supreme Court of the United States on June 1, 1964, held that "the price fixing authorized by the Ohio Fair Trade Act and involving goods moving in interstate commerce would be, in the absence of approval of Congress, clearly illegal under the Sherman

Act * * *. Congress, however, in the McGuire Act has approved state statutes sanctioning resale price maintenance schedules such as those involved here." Therefore the court affirmed the Supreme Court of Ohio (*Hudson Distributors, Inc.,* v. *Eli Lilly & Co.,* 377 U. S. 386).

In July 1963, a visiting judge assigned to this court tried the second phase of the case wherein the defendant Lilly seeks on its cross-petition to recover from the plaintiff, Hudson Distributors, Inc., affirmative relief under favor of Sections 1333.27 to 1333.34, Revised Code. After a judgment for Lilly a new trial was granted. For four weeks in June 1965, this court heard testimony on the issues raised by Lilly's cross-petition, Hudson's answer thereto, and Lilly's reply.

## Statement of Facts.

Hudson, a Michigan corporation, is owner of a small retail drug store at 415 Euclid Avenue, Cleveland, Ohio (opened in March 1959), where it sells vitamins, drugs, patent and proprietary medicine and many other items which are manufactured by numerous firms in interstate commerce, and on which minimum retail prices have been set. Presently it does not dispense prescriptions. A year and one-half after the filing of this action it became a subsidiary of Revco D. S., Inc.; and, although separately owned, it has, since June 1961, been known as a "Revco Discount Drug Center" and has been so identified in newspaper and other advertising. Hudson continues to operate the store involved in this case.

Lilly, an Indiana corporation doing business in the Cleveland area, manufactures pharmaceutical and other commodities and distributes them in Ohio and throughout the United States. Lilly identifies almost all of its commodities by its trade mark, trade names and brand names; excepting prescription items, they are in free and open competition with commodities of the same general class produced by others and offered for sale in the same general market area; and such commodities have been promoted and advertised throughout the United States in trade journals, magazines of national circulation and other media. There is no evidence, however, that Lilly has made any other specific effort in this community to create good will for the manufacturer or its products.

On October 1, 1959, Lilly gave written notice to Hudson.

and all other known pharmaceutical outlets selling its commodities in Ohio, that its policy was to establish minimum retail resale prices for its commodities pursuant to Sections 1333.27 to 1333.34, Revised Code, and that it had set up such prices; and it invited them to enter into so-called fair trade contracts with Lilly. Hudson did not sign such an agreement with Lilly or any other firm. Many other pharmaceutical outlets in Cuyahoga County, however, did make such contracts with Lilly. Lilly witnesses professed not to be inforced as to how many signed fair trade contracts it had in this area. The testimony, however, brought out the names of at least a dozen drug outlets which had entered such contracts in 1959 or early in 1960, among them several of the largest chains with stores throughout the community. In its opinion on the constitutional question in this case the United States Supreme Court noted that more than 65% of all retail pharmacists in Ohio had signed fair trade contracts with Lilly. After receiving the above-mentioned notice, Hudson acquired commodities bearing Lilly's trade names, trade mark and brand names, and from then until the present time has offered for sale, advertised and sold the same for less than the established minimum resale prices. From time to time down to the present Lilly has informed Hudson of changes in its resale prices.

Lilly notified Hudson not to sell its products below fair trade prices but Hudson has continued to do so. Presently Hudson prominently displays Lilly products in its store, illustrates the same in its printed advertising and invites the public to purchase Lilly and other pharmaceuticals at reduced prices.

Lilly maintains a district office in the Cleveland area and employs a force of 18 salesmen who call on physicians, dentists and retail drug outlets. They make frequent calls to introduce and promote the sale of Lilly products and at times take orders for the same. Retail stores, however, deal generally with wholesalers in this area, from whom they buy Lilly products at uniform established wholesale prices. For a brief period prior to July 1963, Lilly's salesmen were instructed to check on discount price sales in the area. They have not done so since.

There are in Cuyahoga County about 500 retail drug stores. Of this number approximately 145 are affiliated with chains as follows: Leader Discount 35, Marshall 26, Revco 25, Grey Rexall

19, Sherwood 11, Miller 9, Jay 6, Rudd 4, Shauter 4, Avellone 3, and Baskind 3. The corporate set-up of these chains and the ownership of individual stores in them are not established by testimony. In addition, pharmaceuticals, and particularly vitamins, are sold in other outlets that do not hold themselves out primarily as drug stores.

As early as 1958, before the coming of Hudson, more than a dozen drug stores throughout the area were advertising cut-rate drugs, among them a store run by one of Lilly's witnesses.

After the present Fair Trade Act became effective in 1959, almost immediately the selling of pharmaceuticals and other fair-traded products at less than established resale prices became quite general. For example, the operator of one large chain, on February 12, 1960, signed a contract with Lilly agreeing to abide by its minimum resale prices and by March 24, 1960, was violating the contract by cutting below these prices.

The testimony, particularly of Hudson's witnesses but also of Lilly's, clearly establishes that from 1960 to date selling at reduced prices, under the established minimum resale prices of Lilly and many other competing manufacturers, has been open, notorious, continuous, general and popular throughout Cuyahoga County. It is practiced by small, individually-owned stores and by outlets affiliated with all the so-called chains. By shopping in all parts of the area and in all types of stores, Hudson's witnesses established without challenge that they had made purchases at reduced prices in well over one hundred outlets, including places whose owners had fair trade contracts with Lilly. On behalf of Lilly eight pharmacists appeared, one the operator of a large chain. All testified they had entered into fair trade contracts with Lilly and had proceeded almost immediately to violate the same without having terminated the contract by notice. Each justified his breach of contract on essentially the same ground: "Our retail competitors are selling below minimum resale prices. Upon satisfactory proof that our competitors have stopped discounting Lilly products then we shall comply." Several singled out Hudson or Revco for special blame as discounters. Although it has been well aware of such breaches of contract, Lilly at no time has sought to enforce in court the clear terms of its written agreements against any such violators.

In addition to selling at reduced prices, the evidence establishes that many stores (some individually owned and others in large chains) throughout the community have been offering concessions in the form of trading stamps or merchandise exceeding in extrinsic value the amount permitted by Section 1333.32, Revised Code, thus causing the price of the article sold to fall below the stipulated minimum resale price. This popular form of sales promotion has been indulged in by some merchants with whom Lilly has fair trade contracts. It does not apply to Hudson.

Photographic evidence establishes that a large number of stores in all parts of the community by posters in their front windows advertise one or more of the following: discount prices, double eagle stamps, sales inducement features, and Lilly and other products at reduced prices. These announcements are so prominent that only a blind person passing a store could fail to see them and be informed of the advertiser's disregard of minimum resale prices.

The evidence is undisputed that at least since 1961, frequently there have been appearing in the newspapers of general circulation in Greater Cleveland advertisements by at least four of the largest chains of drug stores (including the chain with which Hudson is affiliated), and by individually-owned outlets, in which they have offered for sale Lilly and other pharmaceutical products at less than stipulated minimum resale prices.

The evidence indicates that the reduced prices at which pharmaceuticals in general, and specifically Lilly products, have been selling in discount outlets in this county vary considerably and, in the absence of any enforcement of Sections 1333.27 to 1333.34, Revised Code, have largely been influenced by free competition. There is no evidence in this case of price wars among retailers, or of any chain of drug outlets obtaining or attempting to obtain a monopoly of any sort or to fix prices in restraint of fair trade. From all the evidence it is a logical inference that in Cuyahoga County for the past six years there has prevailed in the business of retailing pharmaceutical products the kind of free enterprise system that would have existed had the Legislature not enacted the so-called Fair Trade Act.

In the face of massive disregard of the Act by both the retailers and the consumers and citizens of the county, whose

well-being the law proposes to protect, Lilly has taken certain steps since 1959 to maintain its minimum resale price structure as duly established by it according to the Act.

Between December 1959 and April 1960, Lilly sent seven warning letters to drug outlets in Cuyahoga County. One to a large chain, with whom Lilly has a fair trade contract, threatened suit; but to date it has brought about no let-up by this outfit in discount sales. One department store indicated it would comply; but it still under-prices and apparently gives trading stamps on Lilly products in excess of the percentage permitted by Section 1333.32, Revised Code. The latest warning letter went from Lilly to this store in March 1965.

In April 1960, Lilly sued Giant Tiger, but the case was dismissed in 1963 for want of prosecution, the store having discontinued pharmaceutical sales. A suit against National Discount Company brought no answer, and in 1963 resulted in a default injunction against sales below minimum prices; but apparently the store had gone out of business.

At no time from 1960 to date has a suit been brought by Lilly against any discounter that, prior to price-cutting, had executed a fair trade contract.

After the Ohio Supreme Court's decisoin of May 8, 1963, Lilly sent a form letter to all pharmacies in Cuyahoga County saying it was attempting to enforce its minimum resale prices. Between June and October 1963, it sent letters to 19 different alleged discount sellers, some of whom had previously signed contracts with Lilly. Local counsel then sent follow-up letters to 17 different outlets in the same group with a warning of suit unless discount sales were stopped immediately. Six letters went to separate Giant Tiger stores on July 26, 1963, after suit against Giant Tiger had been dismissed, as noted above, just two months before.

On August 24, 1963, Lilly filed three suits against alleged violators. One was dismissed at Lilly's cost within two weeks upon defendant's promise to comply; but this store is still discounting. Lilly made no effort to get a consent injunction decree. The dismissal came on the very day that a hearing was scheduled on a motion for a temporary restraining order. The second suit was dismissed at Lilly's cost six weeks after filing, on defendant's statement that it was no longer selling Lilly

products. The third case, *Eli Lilly & Co.* v. *Standard Drug Co.*, *d. b. a. Revco Discount Drug Centers*, is still pending.

From June 1, 1964, to June 1, 1965, when this trial began (all doubt as to constitutionality of the Act in this county having been removed), Lilly at one time or another has sent letters to a total of 16 different retailers alleged to be selling at discount prices. They are still selling below the set fair trade prices. In this period Lilly filed one suit, now pending against H. J. Sherwood Company, to enjoin selling Lilly products below minimum resale prices.

Shortly before this trial Lilly professionally shopped 16 stores and found discount selling. Five of these received form warnings from Lilly's office in Indianapolis and four got threats of suit from local counsel. They continue to sell at less than established resale prices.

During the period from 1959 to date, Lilly's salesmen in the Cleveland area have periodically called on retail drug outlets that have been selling below Lilly's set resale prices. They have been introducing and promoting Lilly products with a view to getting these merchants to buy them.

The volume of Lilly sales in 1964 in Greater Cleveland was greater than in 1963, and sales for the first 5 months of 1965 showed an increase over the same period in 1964.

Conclusions of Law.

Turning to the law in the case, the court at the outset must state that the Ohio Fair Trade Act is constitutional in this case in Cuyahoga County. By way of affirmative defense Hudson calls attention to the patent fact that the Act has been held unconstitutional in Hamilton, Franklin and other counties, and that it is not being enforced in any other county in Ohio save one. Hudson cites Section 26, Article II of the Constitution of Ohio which says in part: ''All laws, of a general nature, shall have a uniform operation throughout the State * * *.'' Hudson contends that the existing situation makes for unequal and erratic operation and violates the constitutional section mentioned, and the due process and equal protection clauses of both the Ohio and United States Constitutions.

This court is bound by the learned opinion of the Court of Appeals of Cuyahoga County upholding the Act in 1961, cited above, and not free to speculate on the non-signer clause

which the Act contains. The situation of which Hudson complains results from the ill-advised provision of Section 2, Article IV of the Constitution, which presently makes possible much confusion and doubt as to the status of fair trade enforcement in Ohio. This does not justify this court, however, in disregarding the well-established principle that a court of first impression follows the rulings of the appellate court of its district. This disposes of Hudson's second and seventh affirmative defenses.

Hudson contends in its sixth affirmative defense that Lilly's fair-trade contract compels retailers to enter into horizontal price-fixing agreements with other retailers and therefore the contract violates the Sherman Antitrust Act and the McGuire Act. The court does not consider that horizontal price-fixing is involved in this case. There is no evidence that paragraph 6 of Lilly's contract was ever used, and the testimony is that Lilly does not intend to use it. Presuming that paragraph 6 were invalid, the rest of Lilly's fair trade agreement might still be enforceable. *Suesskind* v. *Wilson* (1931), 124 Ohio St. 54, says in the syllabus:

"Where an agreement founded on a legal consideration contains several promises, or a promise to do several things, and a part only of the things to be done are illegal, the promises which can be separated, or the promise, so far as it can be separated, from the illegality, may be valid."

The court has grave doubts whether prescription items, which lose their identity when dispensed by a pharmacist, are covered by the Fair Trade Act. However, the court need not pass on this point, raised in Hudson's eighth defense, because there is no testimony as to prescription sales since Hudson does not have such a department.

By reason of legislative fiat Hudson has indulged in "an act of unfair competition," on the basis of the recited facts, in selling Lilly products below minimum resale prices after notice. Therefore if Lilly has fully complied with the statute it may be entitled to injunctive relief unless it is barred by one or more of the affirmative defenses interposed by Hudson.

The Ohio Fair Trade Act gives statutory relief to one "suffering or reasonably anticipating damage by reason of a

violation" of the Act. Implicit in the Act is the fact that the remedies provided are equitable in nature. A restraining order is typical of equity. Section 1333.32 (C), Revised Code, says: "It shall be no defense to a prayer for an injunction * * * that there is an adequate remedy at law." This removes only one of the accustomed equitable defenses, and inferentially leaves others provided they are appropriate.

"Although injunction in Ohio is to a certain degree statutory, it has always been recognized to be equitable in its nature and subject to the rules of courts of chancery." 29 Ohio Jurisprudence 2d 167, Injunctions, Section 3.

As early as 1938 it was held that in enforcing a fair trade law "equitable principles must be applied suitable to the nature and purpose of the law involved." *Calvert Distillers Corp.* v. *Nussbaum Liquor Store, Inc.* (Sup. Ct. New York, 1938), 166 Misc. 342, 345, 2 N. Y. Supp. 2d 320, 324. "While the Fair Trade Act does not make provision therefor, the courts have engrafted equitable defenses on the right of the manufacturer to enforce the Fair Trade Act." *Lionel Corp.* v. *Klein* (Del. Chan., 1955), 114 A. 2d 652, 654.

The Ohio Fair Trade Act is broad in its scope. It differs from every act called by a similar title in other states, except that of the state of Virginia, so far as its theory of a contract implied in fact goes in relation to nonsigners. As the United States Supreme Court said in this case, it is a price-fixing measure which the state legislature might enact under favor of the McGuire Act. Now the General Assembly in adopting the Act did not set up any broad, general rules for its application or provide an administrative agency to assist in its enforcement after due investigation of alleged violations. If in its wisdom the Legislature had done so it would have made available a quick and certain means of assuring enforcement of the law. Instead it left the serious problem of enforcement, first, to one allegedly damaged, in each separate instance, by reason of a violation, and then to the court before which an aggrieved party must hail each individual violator. As the court said in *Calvert Distillers Corp.* v. *Nussbaum Liquor Store, Inc., supra,* at 344: "Naturally, the more general and indefinite the legislative mandate, the wider will be the opportunity

for judicial construction and, obviously, for judicial difference—a situation which must have been anticipated when this type of statute was enacted.''

The essentials of fair trade enforcement in Ohio differ materially from those in other jurisdictions because of the widespread, utter breakdown in observance of the Act in this state and county due to the confusion mentioned above. These facts impose upon one seeking an injunction in this type of case in Ohio a greater duty of diligence in protecting price maintenance before coming into court than might be required in jurisdictions where the status of fair trade laws is clear-cut and nonobservance is minimal. For this reason the dicta of foreign courts, frequently quoted, may be of little help to a court in Ohio in its endeavor to face realities here and do justly between the parties.

To the court, therefore, is left the duty of determining what requisites, in view of the peculiar situation here prevailing, a manufacturer (who has the prime duty of maintaining its own price structure) must in good conscience observe before it can expect the court to intervene on its behalf with an injunction.

1. One seeking enforcement must *comply with all statutory requirements* set forth in Sections 1333.29 and 1333.30, Revised Code. This Lilly has done.

2. Where there is widespread and popular support of selling below established minimum resale prices, as the evidence indicates there has been in this community for five or six years, the enforcer should first *endeavor to convince consumers*, through media of communication, that the law was enacted, as it says, to further wholesome competition, prevent monopoly, promote the public welfare, increase gainful employment, et cetera, ''all for the benefit of the consumer and well-being of the citizens of the state,'' and therefore it is to the consumer's interest to patronize those who sell at fixed fair trade prices higher than prices in cut-rate outlets.

So long as consumers cling to the old-fashioned notion that free competition is the life of trade and that the philosophy of trade is to buy in the lowest market and to sell in the highest, they will buy quality products where they can get them cheapest. Fair trade could be enforced over night if the more than a million and one-half people of this community were convinced

that price fixing was as good for their well-being as the Act says it is. No law which merely makes some action *malum prohibitum*, and involves no moral turpitude, in the last analysis can be enforced generally unless it has back of it a wide consensus of popular support. Seriously convinced of the benefit to the public of the fair trade law, and in the maintenance of higher selling prices which is supported by it, one seeking enforcement has a duty of endeavoring to win popular support for one's point of view. Once attained, this might eliminate the need of court action. Lilly has taken no step in this direction. The consumer's interest in the matter of prices has been completely overlooked.

3. One seeking an injunction must allege and *prove that one is justified in suing.* Section 1333.32 (B), Revised Code, says in part: "Any person suffering or reasonably anticipating damage by reason of a violation of this section may bring suit * * *." Here Lilly sues a non-signer which has been promoting the sale of Lilly's products by printing pictures of them in its advertising and urging the public to buy them at a reduced price. True, Hudson has at the same time been advertising its own lower-priced brands of pharmaceuticals, as have practically all other druggists who testified. Has this caused Lilly damage or apprehension? Lilly made no effort to show any monetary damage (and it did not have to do so to obtain injunctive relief) and there was not a word of testimony to the effect that Lilly had suffered damage to its good will, trade mark, trade names or brand names (in which, under the statute, it retains a proprietary interest even when the same are on products in the hands of a retailer who, a non-signer, has bought Lilly products for resale). The court is asked to imply this merely from the Act itself. But the Act does not say this although it spells out almost everything else. It does say among other things that one of its purposes is "to safeguard the good will of trade marks and trade names"; it does permit price-fixing by the manufacturer; it does make it unlawful for a distributor to sell at lower than fixed prices. But does it inevitably follow that selling below the fixed price damages the manufacturer's good will? Where is the factual evidence of this here or in any other case that has come to the court's attention? True there has been *dicta* to this effect in some cases,

and there has been such *opinion* expressed by proponents of price-fixing in learned articles. Here is an example of how the idea gets currency: An article in 15 Western Res. L. R. 89 (1963) quotes as follows from *Old Dearborn Distr. Co.* v. *Seagram-Distillers Corp.* (1936), 299 U. S. 183, at page 195:

"There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the general public as well."

It suited the author's purpose to stop there. But the court went further and in the same paragraph said:

"The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, *there is evidence, opinion and argument to the contrary*; but it does not concern us to determine where the weight lies. We need say no more than that *the question may be regarded as fairly open to differences of opinion*." (Emphasis added.)

On March 6, 1965, Judge William K. Thomas of this court, in the case of *Rubbermaid, Inc.,* v. *Claber Distributing Co.,* No. 784774 (3 Ohio Misc. 39), granted an injunction restraining price-cutting. As will be pointed out later, the basic facts as to violation and enforcement program were quite different from in the instant case. However, there was evidence of the effect upon the producer's trade mark and trade name of sales of its products at one-third off the manufacturer's established price. On page 16 of his opinion Judge Thomas said:

"There is nothing to indicate that Uncle Bill's sale of Rubbermaid products at one-third off list price has cheapened Rubbermaid in the eyes of the purchasing public. On the contrary it is quite clear in the record that the Rubbermaid trade mark and trade name remain synonymous with quality. Human nature, being what it is, a consumer wants Rubbermaid quality at the lowest price. Illustratively, a Rubbermaid witness was asked, 'When people learn prices are reduced would that affect good will?' He honestly answered, '. . . When we generally reduce a price, we hope the consumer will say, "Gee, that's wonderful, now I can afford this item, maybe".'

"Upon the evidence it is determined that consumer good

will (demand) for Rubbermaid products is not impaired by reductions below previous fair-traded prices. Accordingly it is found that consumer good will for Rubbermaid is not adversely affected or disadvantaged by price reductions on Rubbermaid's fair trade products, whether Rubbermaid or Uncle Bill's reduces the prices.''

In short, this court has heard no *testimony* in this case, and unearthed no reference in any reported case to *factual evidence* that there is a causal connection between a retailer selling at less than the so-called fair trade price and a loss of good will or damage to trade or brand names. With *casual opinions* on the subject the court is not concerned without knowing the backgrounds of the ones who expressed the opinions. Indeed, the only review of actual evidence on this subject which this court has noted is in *Rubbermaid*, and there is was clearly established that a price reduction below list, made by the retailer to promote sales, had no adverse effect whatever on the manufacturer's good will or trade name. It is high time for courts to stop drawing economic conclusions based only on *dicta* in old opinions and not on factual evidence. It is high time that in this field of the law courts stop making inferences which are based merely on other inferences.

Anent the collateral question of the possibility of Lilly having suffered a loss of business by reason of Hudson's selling at less than Lilly's fixed retail prices (on which there was no testimony), the court was impressed by the evidence of Lilly's district manager that (with Lilly's pharmaceuticals selling widely in the Cleveland area at less than fixed retail prices) Lilly's overall sales were higher here in 1964 than in 1963, and higher in the first five months of 1965 than in a similar period in 1964. Since Lilly's wholesale prices are the same for all retailers it lost no profits in this price-cutting area in recent years; business is booming. The consumers must still have a high regard for Lilly products. In the face of such testimony how can a court infer that Lilly's good will has been harmed?

The point is this: in the absence of any testimony that the enforcer has suffered or reasonably anticipates suffering any damage of any sort (either money loss to its business or actual harm to its good will) the court seriously doubts whether

Lilly in this suit has pictured itself as one "suffering or reasonably anticipating damage by reason of" Hudson's violation as a condition precedent to bringing suit.

4. Before beginning suit, one who is suffering or anticipating damage by reason of a violation must *pursue a vigorous, aggressive and unrelenting effort to discover those selling below fixed prices and to get them to abide by the law.* Massive disregard of the price-fixing statute calls for a massive effort on the part of those in whose hands the Legislature has put primarily the job of seeing that the law is enforced. The courts should not be resorted to until such effort has been made. Where a manufacturer seeks enforcement in an area with widespread violation these measures commend themselves as being reasonable:

(A) Periodic and thorough investigations throughout the area to determine who are under-selling.

(B) Immediate and persistent requests to all violators asking them to abide by the manufacturer's established resale prices.

(C) If some indicate assent, then in a reasonable time a spot-check and continuing follow-up to see whether they are actually selling at fair-trade prices.

(D) To those who do not agree or who revert to price-cutting, a notice that suit for an injunction will be started under favor of the statute.

In the instant case Lilly did take some of these steps to the extent indicated in the recital of facts above. But its investigations were sporadic. Once in 1963 it had its salesmen make a check. These employees have always had excellent means of observing what is going on in drug stores all over the county. But for the past year, when there has been no doubt as to the law's constitutionality here, the salesmen have had no orders to check on any underselling. Lilly resorted to professional shopping to a limited extent just prior to the trial of this suit.

Lilly's letters to alleged violators have been few and far between. In 1963 letters went to 22 different outfits (plus six to stores in one chain). In 1964 letters went to eleven different firms (plus four to stores in one chain). In 1965, just before this trial began, it sent out five letters.

In several instances Lilly obtained assurance that stores would abide by fair trade prices. There was no follow-up investigation. The evidence is that these outlets reverted almost immediately to cut-rate selling.

Lilly has been negligent in its enforcement program in not utilizing its salesmen to keep it informed as to the general, open, easily observable and widespread cut-rate selling of its products in Cuyahoga County. Apparently never once, except in the case of Hudson, did Lilly or its local employees take note of the numerous advertisements in local papers where their products were being offered at less than fixed prices over a period of at least four years. Lilly must be charged with notice of the price-cutting situation in this county. The court concludes that Lilly's before-suit efforts have not been fruitful of results or reasonably diligent. The courts have uniformly held that "* * * a failure to use reasonable diligence to enforce compliance by others may call for or require a denial of injunctive relief * * *." *Dart Drug Corp. of Maryland* v. *Eli Lilly & Co.* (1958), 216 Md. 20, 23, 139 A. 2d 272.

Between December 1959 and April 1960, Lilly sent seven warning letters to drug outlets in Cuyahoga County. One to a large chain, with whom Lilly has a fair trade contract, threatened suit, but to date the cross-petitioner has brought about no let-up by this outfit in discount sales. One department store indicated it would comply, but it still under-prices and apparently gives trading stamps on Lilly products in excess of the percentage permitted by Section 1333.32, Revised Code. The latest warning letter went from Lilly to this store in March 1965.

In April 1960, Lilly sued Giant Tiger, but the case was dismissed in 1963 for want of prosecution, the store having discontinued drug sales. A suit against National Discount Company brought no answer, and in 1963 resulted in a default injunction against sales below minimum prices; but apparently the store had gone out of business.

At no time from 1960 to date has a suit been brought by Lilly against any discounter which, prior to price-cutting, had actually executed a fair trade contract.

After the Ohio Supreme Court's decision of May 8, 1963, Lilly sent a form letter to all pharmacies in Cuyahoga County saying they were attempting to enforce their minimum resale

prices. Between June and October 1963, it sent letters to 19 different alleged discount sellers, some of whom had previously signed contracts with Lilly. Local counsel then sent follow-up letters to 17 different outlets in the same group with a warning of suit unless discount sales were stopped immediately. Six letters went to separate Giant Tiger stores on July 26, 1963, after suit against Giant Tiger had been dismissed, as noted above, just two months before.

On August 24, 1963, Lilly filed three suits against alleged violators. One was dismissed at Lilly's cost within two weeks upon defendant's promise to comply; but this store is still discounting. Lilly made no effort to get a consent injunction decree. The dismissal came on the very day that a hearing was scheduled on a motion for a temporary restraining order. The second suit was dismissed at Lilly's cost six weeks after filing, on defendant's statement that they were no longer selling Lilly products. The third case, *Eli Lilly & Co.* v. *Standard Drug Co., d. b. a. Revco Discount Drug Centers*, is still pending.

From June 1, 1964, to June 1, 1965, when this trial began (all doubt as to constitutionality of the Act in this county having been removed), Lilly at one time or another has sent letters to a total of 16 different retailers alleged to be selling at discount prices. They are still selling below the set fair trade prices. In this period Lilly filed one suit, now pending against H. J. Sherwood Company to enjoin selling Lilly products below minimum resale prices.

Shortly before this trial the cross-petitioner professionally shopped in 16 stores and found discount selling. Five of these received form warnings from Lilly's office in Indianapolis and four got threats of suit from local counsel. They continue to sell at less than established resale prices. Eight of Lilly's witnesses, retail pharmacists who are selling at less than fair trade prices, professed that they would comply with the Act if all their competitors did, and several singled out Hudson or Revco for special blame as discounters.

5. Having knowledge of violations of its established minimum resale price schedule, *a manufacturer cannot maintain a "business-as-usual" attitude toward the violators.*

"Where [a producer or owner invoking the provisions of the statute] does not resort to legal action, he is required to use

reasonable diligence to see to it that none of his products continue to be sold to a retailer who cuts prices after the producer has notice of such violation; and in the last analysis, the question comes down to whether the producer or owner by his act or conduct, whether of commission or omission, may be said to have waived or abandoned his right, with respect to all retailers under the statute or agreement made thereunder.'' 125 A. L. R. 1362, commenting on *Calvert Distillers Corp.* v. *Stockman* (1939), 26 F. Supp. 73.

Even in the face of obvious violations of its signed contracts with retailers, and continuing non-observance of fair-trade prices by non-signers, Lilly's salesmen have periodically called on these violators, checked on their stock, promoted Lilly's products, in some instances passed on their orders to wholesalers and continued to manifest Lilly's service to them. In this connection the dicta in *General Electric Co.* v. *S. Klein-on-the-Square, Inc.* (1953), 121 N. Y. Supp. 2d 37, 56, against not selling to violators has no application here, since this court is not suggesting that Lilly can or should stop *sales* to cut-rate stores. Nevertheless it well may be asked: ''Of what effect is a warning letter from Lilly one day as to price-cutting, when a day or two thereafter a Lilly salesman shows up and offers friendly service as usual?'' One cannot acquiesce in conduct by many others and expect to enjoin one party from pursuing the same course. The right to an injunction may be lost by acquiescence.

6. *A manufacturer having fair-trade contracts executed with retailers cannot acquiesce in the latter's open violations and expect to enforce the law merely against non-signers.* There has never been any question as to the enforceability of such contracts. *Union Carbide & Carbon Corp.* v. *Bargain Fair, Inc.* (1958), 167 Ohio St. 182, invalidated only the section of the original Fair Trade Act of 1936 as to non-signers, and did not affect the part concerning executed contracts. Even so, Judge Skeel pointed out in his opinion in this case in 1961, 117 Ohio App. 207, supra:

''The cases on contracts between manufacturer and retailers, whereby the retailer agrees to maintain a retail price set by the owner of trademarked or tradenamed goods by which the manufacturer's goods are identified and who, over the years,

has, by expending time and capital, developed what is called 'goodwill' in relation to his product, these contracts being identified and characterized as supporting 'fair trade,' have been upheld as between the parties at common law.''

This court is of the opinion that, since the signed contract portion of the present Act was not challenged when the issue of constitutionality was tried in this case, there never has been a time when Lilly could not have sued, either under the statute or at common law as Judge Skeel said, to enforce its signed contracts, some of which were with large chains and important retailers, not just small stores. The testimony indicates that Lilly felt it would be unfair to enforce against parties to its contracts, and that if sued they might then exercise the option to terminate such contracts in thirty days. With this the court cannot agree. If injury has been suffered by a breach of contract and a cause of action has accrued and suit thereon has been brought, a defendant cannot escape the consequences of his breach by electing to terminate the contract at that late date. It is worth remembering that Lilly did not sue Hudson. It would have been a healthy thing for fair trade enforcement if five years ago Lilly had sought in court to demonstrate that its contract meant something and could not be violated with impunity. Lilly, however, chose to waive all such violations upon the bare promise that ''we'll comply with our contract when we are satisfied by proof that all our competitors are selling at fair-trade prices.'' The court was not impressed by the affidavit of one witness to this effect. The court is convinced that Lilly's acquiescence in violations by those with whom it made fair trade contracts (when it could and should have sought to uphold those contracts) seriously weakens its cause for an injunction against Hudson, a store which never signed a contract.

7. One seeking to enforce its minimum resale price structure under the Fair Trade Act has a duty to *bring violators into court at the earliest opportunity*. That is what that favorite term ''reasonable diligence'' means to this court. Like the ''reasonably prudent man'' who is so frequently encountered in the books, it is a fine sounding term that courts are prone to use freely and at times not too meaningfully. The courts are in agreement, however, that reasonable diligence ''depends

upon each particular set of facts." *General Electric Co.* v. *Home Utilities Co., Inc.* (1955), 131 F. Supp. 838, affd. 227 F. 2d 384.

The court agrees with many previous decisions in other jurisdictions that "it is not a condition precedent to grant of relief to a manufacturer or retailer against a violator of resale price agreements, that such manufacturer or retailer institute legal proceedings to enjoin simultaneously *all* violators of such agreements. 52 American Jurisprudence 658, Trademarks, Sec. 196. It is not enough, however, in the situation prevailing in Cuyahoga County, that he sue only one violator, as one case says. Striking down one, or two, or three violators is not necessarily going to cause all the others to topple like ten pins. In the judgment of the court testimony to such effect is evidence of wishful thinking. Also a witness saying: "I'll be good when and if so-and-so is good," does not convince the court that he is readily going to stop selling his own brand of pharmaceuticals, on which by the testimony he makes 40 per cent profit, just for the honor of selling a nationally advertised brand, on which at fair trade prices he makes only 33-1/3 per cent profit. It is contrary to human nature. The profit motive is still a respectable goal in American life, and so, in the absence of monopoly or unfair restraints, is open and healthy competition.

If fair trade is to be set up and enforced in this area it will only be after a concerted, all-out effort. That attempt in each instance must involve some of the prerequisites previously mentioned. But above all it calls for *a massive attack on violators in the courts*, without any hesitancy as to "clogging the docket," as one witness said. In the opinion of the court one resolved on real enforcement has the duty to sue first the largest outlets alleged to be cutting prices in the area. How many to sue depends on the nature and extent of violations. Each situation must be judged separately. The enforcer can not expect to await the results of one case before starting another case. It was logical for Lilly to sue Revco and Sherwood as it has done, if it considers them violators; but, as indicated above, the court sees no justification for not at the same time suing other larger chains which clearly have been transgressing the Act, including some of Lilly's contract signers. How better could Lilly have impressed on the local trade the serious intent of its

enforcement program, especially in view of the negligible results of its letter writing?

This court cannot accept the theory, indulged in by one decision cited, that injunctive relief in one suit "might be an effective warning to other offenders to desist from unfair practices." *Calvert Distilling Co.* v. *Gold's Drug Stores* (1938), 123 N. J. Eq. 458. That may have been true in view of the facts in that case in New Jersey 27 years ago, but in the light of the situation in Ohio today, and particularly in this county, it simply is not realistic.

Lilly could not be expected to press enforcement against nonsigners in the courts so long as the constitutional question was not finally decided. But what of the last year? One suit, mentioned previously, has been filed against one of the smaller chains. Other than that the court sees no effective effort. The court has studied Lilly's very able and detailed supplemental brief bearing on enforcement, filed after trial, but cannot agree with its conclusion that Lilly's enforcement program was adequate or effective.

The court wishes to illustrate the difficulty of accepting as precedents decisions in other fair trade cases by comparing with the instant case two cases cited by counsel for both parties herein. In *Dart Drug Corp.* v. *Eli Lilly & Co.*, 216 Md. 20, 139 A. 2d 272, *supra*, the court of last resort in Maryland sustained the granting of an injunction against selling at less than minimum resale prices. Here Lilly's salesmen reported violations; warnings were issued and "if necessary, suit was instituted." "With the exception of the (violator being sued) and one other store against which a suit was pending, *enforcement* in (the violator's) area *had been completely effective.*" (Emphasis added.) "No current violations were shown in the immediate area where Dart operates," and out of more than 1,000 stores in all of Maryland violations totaled only 2.2 per cent.

Here, in contrast to many decisions, the facts are clearly narrated. A comparison of the situation in *Dart Drug* with that in the present case makes it obvious that *Dart Drug* is no precedent for granting an injunction in this case.

In *Rubbermaid, supra*, Judge Thomas restrained the defendant from selling below established minimum prices. While

over 1,100 retailers in Ohio, and specifically 150 dealers in Cuyahoga County had entered into Rubbermaid fair trade agreements the defendant had not. With the exception of two subsidiaries of defendant "other retailers are complying with Rubbermaid's minimum retail resale prices." The court found that Rubbermaid had been "diligent in pursuing legal remedies to enforce its established program." Here again is a factual situation entirely different from that revealed by the evidence in this case.

It is the law, and the court cannot conceive that the statute has abrogated it, that one who sues for an injunction must come into court with clean hands. Again, the right to an injunction may be lost by acquiescence or laches. One seeking an injunction in a fair trade enforcement case must have acted with diligence, promptness and thoroughness in every matter related to the overall situation which gave rise to the prayer for such an order. In the opinion of the court the evidence indicates that Lilly has fallen short of these equitable requirements.

For the reasons set forth above the court is not convinced that Lilly is entitled to an injunction and therefore denies its prayer for the same.

An accounting is not provided for in the statute, and while equity might grant it, the court does not believe it is justified. Lilly had ample opportunity in the past five years to elicit testimony as to Hudson's volume of sales and the like either by discovery before trial or by subpoena during trial.

The apportionment of costs rests in the discretion of the court. Hudson, having lost its action for a declaratory judgment bearing on the constitutionality of the Fair Trade Act, will pay all court costs incurred in this one case and entered on the clerk of court's records down to June 1, 1964; and Lilly will pay all court costs which accrued thereafter.

Lilly asks for attorney fees. The court has no doubt that able counsel representing Lilly has earned the fees mentioned in the testimony. The case has been long, complicated, and arduous; it has been handled with consummate skill; and the fact that the court felt compelled to decide it against Lilly in no wise reflects upon counsel's course of action or detracts from the respect which the court entertains for Lilly's counsel.

If attorney fees were to be allowed they would have to be

for the handling of the first phase of the case which was won by the efforts of Lilly's counsel. However, Hudson initiated and prosecuted this suit in good faith to test the constitutionality of a new statute. Eleven judges in three Ohio courts passed on the issue and six of them agreed with Hudson. It would indeed be unjust to penalize Hudson under such circumstances by adding attorney fees to its court costs. The court agrees with the decision made by Judge Thomas on a similar request in *Rubbermaid, supra.* The court must therefore deny the prayer to include attorney fees with costs.

*Judgment accordingly.*